**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **RAYMOND CROWDER, JR.,** | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:05-CV-540-Y** |
| | § | |
| **JO ANNE B. BARNHART,** | § | |
| **COMMISSIONER OF SOCIAL SECURITY,** | § | |
| **DEFENDANT.** | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.      STATEMENT OF THE CASE

Plaintiff Raymond Crowder, Jr., brings this action pursuant to Sections 405(g) and

1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the

Commissioner of Social Security denying his claim for disability benefits under Title II and

supplemental security income or SSI benefits under Title XVI of the Social Security Act.  Crowder

applied for SSI benefits on November 21, 2002 and applied for disability insurance benefits on

January 2, 2003.  (Tr. 56, 250).  Crowder maintained his insured status at all times relevant to the

Commissioner's decision.

After his applications for benefits were denied both initially and on reconsideration, Crowder requested a hearing before an administrative law judge (the "ALJ"), and ALJ Randolph D. Mason held a hearing on May 25, 2004 in Fort Worth, Texas. (Tr. 263-81). Crowder was represented by counsel. On May 28, 2004, the ALJ issued a decision that Crowder was not disabled and not entitled to disability or SSI benefits because he retained the ability to perform a modified range of light work activity. (Tr. 12-19). The Appeals Council denied Crowder's request for review of his case, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 4).

B.      STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of claimant's medical status alone, the impairment or impairments must prevent the

claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.      ISSUES

      1.      Whether the Commissioner's decision is supported by substantial evidence;

      2.      Whether the ALJ properly applied the sequential evaluation process; and

      3.      Whether the ALJ adequately considered Crowder's non-exertional impairments.

D.      ADMINISTRATIVE RECORD

      1.      Treatment History

Crowder was hospitalized on September 27, 2002, after being struck by a car. He complained of left shoulder pain and left hip pain. (Tr. 196). Magnetic resonance imaging (an MRI) of his right shoulder showed a complete tear of his rotator cuff and a tear of the long head of the biceps tendon. (Tr. 145, 177A). There were also some mild degenerative changes in the acromioclavicular (AC) joint.[1] (Tr. 147). An x-ray showed a fracture of Crowder's left clavicle with bone displacement, (Tr. 154), and x-rays of his left hip showed a pelvic fracture and a fracture through the left acetabulum.[2] (Tr. 144, 146). A computed tomography (CT) scan of his pelvis confirmed a fracture extending from the left iliac wing into the acetabulum, as well as an adjacent pelvic hematoma. (Tr. 149). Crowder underwent surgery to repair the right rotator cuff tear on October 3, 2002. He was discharged from the hospital on October 5, 2002.

Follow-up care was administered by Crowder's orthopedic surgeon, Joseph Tejan, M.D. Tejan opined that Crowder's right rotator cuff tear was a chronic tear and probably unrelated to the

---

[1]    The acromioclavicular joint is where the the clavicle meets the acromion, which is the highest part of the shoulder. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 21 (29th ed. 2000).

[2]    The acetabulum is the the large cup-shaped cavity on the lateral surface of the hip bone in which the head of the femur articulates. Id. at 12, 1282.

**Findings, Conclusions and Recommendation**
**Page 4 of 17**

accident. (Tr. 202). Radiology studies on October 23, 2002 showed satisfactory alignment between the left femur and hip with healing fractures, and also showed a stable-appearing fracture of the left clavicle. (Tr. 179). On October 30, 2002 Tejan reported that x-rays revealed satisfactory union of the clavicle fracture and the left hip x-ray showed the joint to be congruent and healing. (Tr. 203). Tejan advised that Crowder should not bear weight for another four weeks and needed to participate in physical therapy with range of motion exercises of the right shoulder. Tejan opined that Crowder was at risk for arthritis in the hip and shoulder, as well as at risk for a recurrent rotator cuff tear. (Tr. 203).

Crowder sought additional follow-up treatment from the Tarrant County Hospital District. He complained of decreased range of motion with pain in the right shoulder, as well as persistent left hip pain. Crowder also reported decreased range of motion in his right wrist. (Tr. 204-205). X-rays of his left wrist were unremarkable, but x-rays of his right wrist showed old healed fractures with post-traumatic osteoarthritis. (Tr. 210). X-rays of Crowder's right shoulder showed no acute fracture or dislocation, and the AC joint was intact. A Hill-Sachs deformity was noted.[3] (Tr. 211). An x-ray of the left hip confirmed an acute fracture of the left pubic ring with no evidence of dislocation. Mild degenerative changes in the left hip joint were also observed. (Tr. 212).

Crowder saw ENT specialist Andrew Vories, M.D., on June 12, 2003 for evaluation of hearing loss in his left ear. Crowder said that he had been unable to hear out of his left ear since childhood. (Tr. 229). Testing measured essentially normal hearing in the right ear with the

---

[3] A Hill-Sachs lesion is a compression fracture of the humeral head, which sometimes occurs after anterior dislocation of the shoulder. *Id*. at 981.

exception of slight hearing loss at 40 decibels, but showed profound hearing loss in Crowder's left ear. (Tr. 229). An MRI of the internal auditory canals was interpreted as normal. (Tr. 227).

In July 2003, an x-ray of Crowder's left hip showed a fracture, which was thought to be an old injury, with no appreciable displacement; some degenerative arthritic changes in the left hip; and a deformity of the ischial tuberosity,[4] which was also attributed to old injury. (Tr. 225). An x-ray of Crowder's left shoulder showed an old healed fracture of the left clavicle with slight degenerative changes in that shoulder. (Tr. 226).

Additional x-rays were also taken of Crowder's right wrist and showed advanced arthritic changes, a deformity of the carpal bones related to an old injury, and a healed fracture of the distal right ulna above the wrist joint. (Tr. 224). Nerve conduction studies of both wrists were performed in September 2003. (Tr. 220-21). The results were abnormal and consistent with bilateral carpal tunnel syndrome. (Tr. 221).

In addition to his physical impairments, Crowder sought assistance from the county mental health clinic in February 2003. (Tr. 237). He complained of multiple medical problems, sleep disturbances, and decreased energy and concentration. His appearance was neat, and he exhibited a normal gait and posture. He was tense, but cooperative, and exhibited a minimally depressed and anxious mood. (Tr. 239). His intellectual functioning was assessed as intact, and he showed fair insight into his condition. The examining psychiatrist diagnosed depression and prescribed Zoloft, which proved helpful in relieving Crowder's depression.

---

[4] The ischial tuberosity is an elongated area of the pelvic bone to which several muscles attach. *Id*. at 1889, 1890.

In February 2004, Crowder reported that he felt well overall when he was taking his medications, which stabilized his mood, but he had been without his medications for approximately six weeks and was experiencing a gradual return of his symptoms. His prescriptions were refilled, and he was instructed to return to the clinic in two and a half months. (Tr. 233-34).

2.      Administrative Hearing

Born June 16, 1950, Crowder was fifty-three years old on the date of the administrative hearing. (Tr. 265). He had been employed as an ironworker for many years, but had not returned to work since his accident in September 2002. (Tr. 266). Crowder testified that pain was his primary complaint. He was unable to find a comfortable position for sitting or lying down, and testified that he had to move about frequently. (Tr. 267). The pain was primarily located in his hip, pelvis, and tailbone, but he also reported being unable to lay on his right side because of shoulder pain. He continued to have symptoms related to carpal tunnel syndrome. (Tr. 268).

Crowder testified that he performed his own housework and cared for his two dogs, but otherwise had no hobbies. (Tr. 268-70). He also picked up trash out of his yard, but had a friend who mowed the yard for him. (Tr. 270). Crowder estimated that he could walk about half a block before needing to rest and relieve the pain that walking caused in his tailbone. (Tr. 268). He estimated that he could sit for fifteen or twenty minutes before needing to change positions, and could stand for about fifteen or twenty minutes. (Tr. 272). He was able to lift a gallon of milk with his left hand, but not with his right hand, and he complained of dropping things. (Tr. 272-73). Crowder had not driven a car in about a year, and relied on his daughter to take him grocery shopping. (Tr. 271). He testified that he spent most of the day watching television while lying on

his sofa, but needed to change positions frequently.

Crowder testified that he would be unable to sit for six hours out of an eight-hour workday because of hip pain, nor did he think he could stand and walk for four hours out of an eight-hour workday. (Tr. 273-74).  He testified that he was unable to use hand tools, and had been told to avoid using all pneumatic or pulsating tools.  He complained that his fingers were numb and hard to manipulate.  (Tr. 275).  Crowder also testified that the medication he took for depression made him feel groggy and impaired his ability to focus.  (Tr. 275-76).

Crowder's daughter, Ela Smith, testified that her father had been active and always had a job before the car accident, but had changed since his accident.  She visited her father three times a week and testified that he stayed in his house and complained of pain and feeling depressed because he had no money and his house was in disrepair.  (Tr. 277).

Vocational expert Todd Harden also testified.  He described Crowder's previous work, which had consisted of assembling metal buildings and structures, as a skilled position that required medium exertion.  (Tr. 279).  The ALJ asked Harden to consider an individual with Crowder's age, education and work experience with the following work-related restrictions:

> Assume that this hypothetical person is only capable of light work, needing frequent opportunities to sit or stand.  No work above the shoulders.  No constant repetition of the same motion with the hands and limited to the lower end of detailed instructions.

(Tr. 279).  Harden testified that there was suitable work, including the position of parking lot attendant (with approximately 25,000 jobs nationwide), folder positions (with approximately 25,000 jobs nationwide), and mail clerk positions (with approximately 60,000 jobs nationwide).  (Tr. 279-

80).  When questioned by Crowder's attorney, Harden agreed that the inability to stand for four hours during the workday would eliminate light work by definition.  Harden also testified that Crowder would have no work skills transferable to sedentary occupations.  (Tr. 280).

     3.     ALJ Decision

The ALJ found that Crowder had not engaged in substantial gainful activity since September 27, 2002.  The ALJ also found that Crowder had severe impairments consisting of carpal tunnel syndrome, a hip disorder, a shoulder disorder, and depression, but did not find that any of these impairments met or medically equaled a listed impairment.  (Tr. 17).  With respect to Crowder's mental impairments, the ALJ found mild restrictions in daily activities and social functioning; moderate deficiencies in concentration, persistence or pace; and no episodes of decompensation. (Tr. 15).  The ALJ determined that Crowder retained the residual functional capacity (RFC) for light work activity that provided frequent opportunities to sit and stand, did not require constant repetition of the same motion with the hands, did not require working above shoulder level, and was limited to jobs at the lower end of detailed instructions.  (Tr. 18).  Based on the Medical-Vocational Guidelines and the vocational expert's testimony, the ALJ found that Crowder was not disabled because he was cable of performing a significant number of jobs available in the national economy. (Tr. 18).  The ALJ concluded that Crowder was not entitled to disability insurance or SSI benefits. (Tr. 18-19).

D.     DISCUSSION

Crowder complains that the Commissioner's decision is unsupported by substantial evidence because the ALJ failed to properly apply the sequential evaluation process, particularly in addressing

whether Crowder's impairments met or equaled the severity of a listed impairment.  Crowder also

complains that the ALJ did not incorporate all of his documented non-exertional impairments in the

residual functional capacity (RFC) assessment.

  1.  Listed Impairment

  Crowder contends that the ALJ erred at Step Three of the sequential evaluation process by

providing only one boilerplate sentence that dismissed the idea that any of Crowder's impairments

met or medically equaled any *per se* disabling listed impairment included in the appendix to the

disability regulations.   Crowder contends that the ALJ failed to adequately entertain the possibility

that Crowder's hip problems meet or equal the criteria of Listing 1.06, which reads:

> 1.06 *Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones*. With:
>   A. Solid union not evident on appropriate medically acceptable imaging and not
> clinically solid;
> and
>   B. Inability to ambulate effectively, as defined in 1.00B2b, and return to effective
> ambulation did not occur or is not expected to occur within 12 months of onset.

20 C.F.R. Part 404, Subpart P, App. 1, § 1.06.

  The ALJ's  summary disposition of the issue of existence of a listed impairment does not,

standing alone, justify disturbing the Commissioner's decision.  The Fifth Circuit has declined to

prescribe any rigid or set formula for the ALJ to follow when articulating the reasons underlying his

decision on disability.  *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).  The ALJ cannot pick

and choose among the evidence, but need not mention each and every piece of evidence in the file

so long as he has developed the record fully and fairly and has sufficiently articulated the basis for

his decision.  *See Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996); *Miller v. Shalala*, 8 F.3d 611,

613 (8th Cir. 1993).  Here, the ALJ's written decision presents an adequate review of the evidence, and Crowder has not shown a lack of substantial evidence to support the determination that he fails to meet or medically equal the criteria of a listed impairment.

No treating or examining source has suggested that there is a lack of solid fusion at the site of Crowder's hip fracture, nor is there clear evidence of Crowder's inability to ambulate effectively as contemplated by the administrative regulations:

> b.  *What We Mean by Inability to Ambulate Effectively*
>
> (1) *Definition.* Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J)[5] to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.
>
> . . . .
>
> (2) *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.* § 1.00B(2)(b)(1)-(2) (footnote added).  There is no indication that Crowder must use a hand-held assistive device.  Crowder also testified that he performed light housework, cooked, cared for his

---

[5]  1.00J addresses the protocol for examining claimants who use orthotics, prosthetics, or assistive devices. *See generally* 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00J. It generally requires that a claimant using orthotic or prosthetic devices be examined with the device in place, while claimants using assistive devices may be examined with and without device unless contraindicated by the medical judgment of a treating or examining physician.  *Id.*

pets, cleaned the yard, and shopped with his daughter, although walking caused pain in his tailbone. (Tr. 15). The ALJ found that Crowder had no impairment meeting or equaling a listed impairment, which would include Listing 1.06, and Crowder has not shown a lack of substantial evidence to support this finding.

2.    RFC Assessment

Crowder contends that the ALJ did not properly consider the work-related impact of his depression, carpal tunnel syndrome, and hearing loss in assessing residual functional capacity (RFC) and presenting an accurate hypothetical question to the vocational expert.  The hypothetical presented to the vocational expert must reasonably incorporate all of the disabilities recognized by the ALJ's residual functional capacity assessment, and the claimant or his representative must be afforded the opportunity to correct any deficiencies in the ALJ's question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A claimant's failure to point out problems in a defective hypothetical does not salvage that hypothetical as a proper basis for a disability determination. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).

Crowder contends that limiting him to the lower end of detailed work as part of the RFC assessment was an insufficient reflection of his moderate impairment in concentration, persistence, or pace as found by the ALJ.  Crowder confuses the ALJ's determination at Steps 2 and 3 of the sequential evaluation process with the mental RFC assessment used at Steps 4 and 5 of the sequential evaluation process. *See* SOCIAL SECURITY RULING 96-8p.

The regulations outline a procedure (referred to as "the technique") for evaluation of mental impairments.  First, symptoms, signs, and laboratory findings are evaluated to determine whether

the claimant has a medically determinable mental impairment.  20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).  Once an impairment is found, the administration will rate the degree of functional limitation resulting from the impairment.  *Id*. §§ 404.1520a(b)(2), 416.920a(b)(2).  Four broad functional areas are recognized:  (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  *Id*. §§ 404.1520a(c)(3), 416.920a(c)(3).  After rating the claimant's functional limitations, the administration determines whether the impairment is severe or not severe (Step Two) given the degree of functional loss found in the four given areas.  *Id*. §§ 404.1520a(d), 416.920a(d).  If the claimant has a severe impairment that neither meets nor equals a listed impairment (Step Three), the adjudicator then proceeds to an assessment of the claimant's residual functional capacity.  *Id*. §§ 404.1520a(d)(3), 416.920a(d)(3). In comparison, the RFC assessment used at Steps Four and Five is a more detailed assessment and itemization of various functions that compose the broader categories, i.e, concentration, persistence or pace, used at Steps 2 and 3.  *See* SOCIAL SECURITY RULING 96-8p.

In applying the technique at Steps 2 and 3 of the sequential evaluation process, the ALJ found that Crowder's depression resulted in mildly restricted daily activities, mildly restricted social functioning, and moderate deficiencies in concentration, persistence or pace. (Tr. 15).  In addressing RFC, which is a separate step in the process, the ALJ found that the effects of Crowder's depression could be accommodated by limiting him to less detailed tasks, and this determination has substantial supporting evidence in the record.  Crowder has complained of impaired concentration and problems focusing, but the record also shows that Crowder's depression has been responsive to medication. Moreover, Crowder presents no evidence to support his speculation about any pace requirements

of the jobs identified by the vocational expert.

Crowder's complaints with respect to his carpal tunnel syndrome are no more availing.  The ALJ found that Crowder needed to avoid tasks requiring constant repetitive hand motions.  Crowder asserts that the ALJ had no basis for the implicit finding that Crowder could perform frequent hand motions.  Activity denoted as frequent occurs from one-third to two-thirds of the workday, while activity denoted as constant occurs from two-thirds of the time to constantly during the workday. DICTIONARY OF OCCUPATIONAL TITLES app. C (rev. 4th ed. 1991).  Although Crowder has bilateral carpal tunnel syndrome confirmed by testing, the ALJ observed that Crowder's physician prescribed conservative treatment measures, including splints and anti-inflammatory medication, but had not recommended surgery.  (Tr. 15). The ALJ also noted that Crowder testified that he performed housekeeping chores, cleaned his yard, and performed light cooking.  The ALJ's assessment that Crowder's carpal tunnel syndrome did not preclude the performance of light work not requiring constant repetitive motion is supported by substantial evidence.[6]

Crowder also complains of the ALJ's failure to consider the vocational impact of the hearing loss in his left ear.  The ALJ acknowledged Crowder had significant hearing loss in his left ear, which dated to childhood, with only minimal hearing loss in his right ear.  (Tr. 14).   The Commissioner asserts that Crowder's hearing loss is not disabling, but this is a misunderstanding of Crowder's complaint.  Crowder has not asserted hearing loss as the cause of his alleged disability.

---

[6] Crowder also complains that the vocational expert's testimony was erroneous as the job of folder as defined in the Dictionary of Occupational Titles (DOT) contemplates constant hand use, which exceeds his RFC; however, Crowder does not lodge similar challenges against the parking lot attendant or mail clerk jobs identified by the vocational expert.  Accordingly, he cannot demonstrate substantial prejudice with respect to any unresolved conflict between the vocational expert's testimony and the DOT with respect to the job of folder.

He only contends that his hearing loss is relevant with respect to the types of occupations that may be suitable for him.

Basic work activities necessary to do most jobs include the capacity to hear. 20 C.F.R. § 404.1521(b)(2). Communication is an important factor in work. SOCIAL SECURITY RULING 85-15. Hearing impairments do not necessarily prevent communication, and different types of work may be compatible with various degrees of hearing loss, but there are so many possible variables, that consultation of vocational reference materials or the assistance of a vocational specialist is often necessary to determine its effect on the broad world of work. *Id.* Admittedly Crowder was able to work for many years despite a hearing impairment, but given that Crowder is unable to perform his previous work, the court cannot say in the first instance that Crowder's documented hearing impairment deserves no weight in the sequential evaluation process. The ALJ did not incorporate Crowder's hearing loss in the RFC assessment or explain why such impairment was being excluded, and did not question the vocational expert about any work-related effect of Crowder's hearing loss. This omission requires remand so that the Commissioner can consider all of Crowder's non-exertional impairments as supported by the record and found by the ALJ.

## RECOMMENDATION

It is recommended that the Commissioner's decision be reversed and remanded for further proceedings consistent with these proposed findings of fact and conclusions of law.

<u>NOTICE OF RIGHT TO OBJECT TO PROPOSED</u>
<u>FINDINGS, CONCLUSIONS AND RECOMMENDATION</u>
<u>AND CONSEQUENCES OF FAILURE TO OBJECT</u>

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until May 19, 2006. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

<u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until May 19, 2006 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the

filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED APRIL 13, 2006.


  /s/   Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE